**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**LAKEVIEW PHARMACY OF**          :
**RACINE, INC.,**
                                 :
           **Plaintiff**              **CIVIL ACTION NO. 3:15-0290**
                                 :
       **v**
                                 :     **(JUDGE MANNION)**
**CATAMARAN CORPORATION,**
                                 :
       **Defendant**
                                 :

## <u>MEMORANDUM</u>

Pending before the court is a motion to dismiss filed on behalf of the defendant, Catamaran Corporation, in which the defendant seeks to dismiss all non-arbitrable claims asserted by the plaintiff, Lakeview Pharmacy of Racine, Inc. (Doc. 11). Based upon the court's review of the motion and related materials, the motion to dismiss will be **GRANTED** with respect to Counts I, II and IV*,* and **DENIED** with respect to Count III.


## I.    FACTUAL AND PROCEDURAL HISTORY[1]

On February 9, 2015, the plaintiff, Lakeview Pharmacy of Racine, Inc. ("Lakeview"), along with twenty-eight other independent pharmacies filed a complaint against the defendant, Catamaran Corporation, for breach of contract under the Uniform Commercial Code (Count I), and in the alternative

---

[1] The facts alleged in plaintiff's complaint must be accepted as true in considering defendant's motion to dismiss. *See* Dieffenbach v. Dept. of Revenue, 490 Fed. Appx. 433, 435 (3d Cir. 2012); Evancho v. Evans, 423 F.3d 347, 350 (3d Cir. 2005).

for breach of common law contract for acting in bad faith in setting prices for prescription drugs (Count II), and the pharmacies also included a claim for breach of common law contract for bad faith responses to successful MAC (maximum allowable cost)  pricing appeals (Count III) and for bad faith in failing to update MAC prices (Count IV). (Doc. 1). In the complaint, all plaintiffs seek damages based on breach of contract and specific performance such that Catamaran will "set in good faith reimbursement rates for generic drugs and make adjustments to MAC prices at a commercially reasonable speed." (Doc. 1, p. 37).

These claims arise from economic losses sustained by the plaintiffs as a result of the alleged unreasonable actions of the defendant. The defendant is a large pharmaceutical benefits manager ("PBM"), incorporated in Delaware, (Doc. 11, p.3), that "contracts with insurance companies, self-insured employers, and government entities to administer their prescription-drug benefit programs." (Doc. 1, ¶45). PBMs operate networks of retail pharmacies, whose customers are members of particular insurance plans for drug coverage ("plan members"). *Id.* ¶¶46-47.

Ultimately, the defendant acts as the middleman between the plan sponsors, plan members, and retail pharmacies including the plaintiff. *Id.* ¶49. The relationship between the defendant, a PBM, and the plaintiff is contractual in nature. *Id.* ¶¶53-54. However, the contract governing the plaintiff and defendant's relationship was not negotiated by the parties

2

themselves; instead, the defendant negotiated the contract through a pharmacy services administration organization ("PSAO"). *Id.* ¶¶53-54, 109. In general, the defendant negotiates contracts with independent pharmacies through PSAOs in bulk, *not* individually. *Id.* The defendant has confidentiality agreements with PSAOs to ensure that "critical aspects of the contracts" remain hidden from the plaintiff and other independent pharmacies in its network. *Id.* ¶¶58-59. In fact, pharmacies, including the plaintiff, do not receive the contract itself ("Provider Agreement"), and instead only receive summary-form documents, which solely provide select principal terms of the contract, as well as the Provider Manual. *Id.* ¶¶110-113. The Provider Manual, developed and amended by the defendant at any time, is binding upon the parties, should there be a contradiction between the Provider Agreement and the Provider Manual, the Manual controls. *Id.* ¶¶113, 116.

When a plan member purchases prescription medication at a retail pharmacy within the defendant's PBM network, the pharmacy inputs the plan member's information into the PBM's electronic system, which then determines the payment amounts owed by the plan sponsor and the plan member (co-pay). *Id.* ¶47. The pharmacy bills the plan member the co-pay, and subsequently learns for the first time the amount of money that it will be reimbursed by the PBM. *Id.* ¶63. This is called "claim adjudication." *Id.* ¶64. Should the reimbursement rates for particular prescription medications change, the plaintiff does not learn of these changes until claim adjudication;

the defendant provides no advance notice. *Id.* ¶65. Reimbursement occurs twice a month, and it includes charges for claim processing. *Id.* ¶¶67-68. The defendant also charges fees for claim denials, claim reversal (even if due to the defendant's own errors), and transaction fees for adjudication reversal and payment claw-back. *Id.* ¶68. The amount that the defendant reimburses independent pharmacies such as the plaintiff depends upon its own determination of reimbursement rates. With regard to brand name drugs, the defendant reimburses pharmacies at a percentage of the average wholesale price ("AWP") plus a dispensing fee. *Id.* ¶71. For multi-source generic drugs (non-brand name), the defendant reimburses pharmacies based upon the maximum allowable cost ("MAC"), partially derived from AWPs. *Id.* ¶73.

The MAC calculations and reimbursement rates are also modified to comply with the defendant's obligation to plan sponsors to provide a particular Generic Effective Rate ("GER") discounted off of the AWP. *Id.* ¶76; *see also id.* ¶¶76-78. The defendant allegedly "minimizes and eliminates margins that pharmacies can make on generics through manipulation of its MAC prices," which impacts the financial health of pharmacies in the PBM's network. *Id.* ¶¶80-81. The defendant determines MAC prices that create low reimbursements for pharmacies, and then charges the plan sponsors high amounts, so that it creates a greater margin by which the defendant can generate profit (i.e. price spreading). *Id.* ¶¶84-85. Furthermore, the defendant often sets reimbursement amounts that are less than the cost of the drug

4

itself, and reimbursements often fail to produce margins that would allow pharmacies to sustain business operations and instead result in significant economic losses. *Id.* ¶¶87-90.

Should the plaintiff desire to challenge the defendant's MAC rate, its remedy is in the form of a "MAC pricing appeal." *Id.* ¶119; (Doc. 1, Ex. A, p. 20). All appeals must be directed at the defendant, and most are submitted by PSAOs on behalf of individual pharmacies like the plaintiff. (Doc. 1, ¶¶119, 121). The defendant allegedly often fails to respond to appeals promptly, sometimes fails to respond at all, and never retroactively reimburses pharmacies that are successful in their appeals. *Id*. ¶122.

At this point in litigation, the defendant has not yet answered the Complaint, but instead, on April 20, 2015, filed the instant Motion to Dismiss Non-Arbitrable Claims and to Compel Arbitration. (Doc. 11). The plaintiff, Lakeview, submitted a brief in opposition to the motion on May 4, 2015, (Doc. 13), to which the defendant filed a brief in reply on May 18, 2015. (Doc. 15). On July 16, 2015, we partially resolved the defendant's motion by granting the motion to compel arbitration with respect to all parties except for Lakeview. (Doc. 20). The instant motion to dismiss Lakeview's non-arbitrable claims for failure to state a claim is fully briefed and ripe for review by the court.

## II.    STANDARD OF REVIEW

The defendant's motion to dismiss is brought pursuant to the provisions

of Fed.R.Civ.P. 12(b)(6). This rule provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005), and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007) (abrogating "no set of facts" language found in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The facts alleged must be sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. 544, 127 S. Ct. at 1965. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's cause of action. *Id.* Furthermore, in order to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (brackets and quotations marks omitted) (quoting Twombly, 550 U.S. 544, 127 S. Ct. at 1964-65).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. *See* Sands v. McCormick, 502 F.3d 263 (3d Cir. 2007). The court may also consider

6

"undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002). However, the court may not rely on other parts of the record in determining a motion to dismiss. *See* Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

Generally, the court should grant leave to amend a complaint before dismissing it as merely deficient. *See*, *e.g.*, Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007); Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." Alston v. Parker, 363 F.3d 229, 236 (3d Cir. 2004).

## III.   DISCUSSION

### A.   The Uniform Commercial Code Does Not Govern the Plaintiff's Contract with the Defendant

The defendant moves to dismiss Count I of the Complaint for failure to state a claim. In Count I, the plaintiff alleges that the defendant violated Article 2 of the Uniform Commercial Code ("UCC") by setting MAC prices in bad faith. (Doc. 1, pp. 24-29). The defendant moves to dismiss on the grounds that Article 2 of the Illinois UCC solely governs "transactions in goods," and the contract between the plaintiff and defendant does not involve the sale of goods and therefore does not constitute a "transaction in goods." (Doc. 11, p.13).  The plaintiff argues that the term "transactions in goods," has broader scope for the purpose of Article 2, and in fact, covers transactions where a sale of goods does not occur. (Doc. 13, pp. 5-6).

Article 2 of the UCC solely governs "transactions in goods." 810 ILCS 5/2-102. "Goods" for the purposes of Article 2 are "all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale." *Id.* at 5/2-105. As the plaintiff states, and the defendant does not dispute, prescription drugs are "goods" under Article 2. Article 2 does not apply to contracts for services. *Id.* at 5/2-102; *see also* Armagan v. Pesah, 7 N.E. 3d 148, 160 (App. Ill. 2014).

The term "transactions in goods" generally refers to transactions

involving sales of goods, but Illinois law indicates that in specific circumstances the term may include situations where a sale does not occur. *See* In re Pearson Indus., 147 B.R. 914, 922 (Bankr. C.D. Ill. 1992). The plaintiff in this case argues that the term "transactions in goods" is vast enough to encompass cases where the contract in question solely has a significant effect on or is closely related to a separate sale of goods. (Doc. 1, ¶130); (Doc. 13, pp. 5-7). However, the case-law that supports an expanded definition of transaction does not stretch the definition as far as the plaintiff would like.

The plaintiff relies on *In re Pearson Industries,* a case involving an arrangement between a wholesale tire seller and a manufacturer, where the seller's tires were delivered to the manufacturer's warehouse for incorporation into the manufacturer's products. 147 B.R. 914. The tires were stored in the warehouse until the manufacturer needed them, at which time the manufacturer would take the tires and then pay the seller for the tires obtained. *Id.* Though the agreement between the seller and manufacturer was for storage and potential sale of tires, the court determined that the situation involved a "transaction in goods" (even if the tires were never obtained by the manufacturer and the sale never consummated). *Id.* at 922. The facts of *In re Pearson* are distinguishable from the facts of the instant action. In *In re Pearson*, the agreement between the parties governed not only the storage of tires, but also the future sale of goods between those *same* two parties.

9

While completion of a sale was not necessary to trigger the provisions of Article 2, the relationship essentially facilitated and governed the transfer of title of goods from one party (seller) to the other party (manufacturer) to the contract. Here, the goods at issue are prescription drugs, belonging to the plaintiff pharmacy and sold to consumers. The defendant neither has nor will ever have possession or title to the prescriptions sold by the plaintiff, and the only two parties between whom title transfers is the plaintiff and consumers. The contract between the plaintiff and defendant here does not create or facilitate the type of relationship contemplated by Article 2 (or *In re Pearson*), namely a buyer-seller relationship.[2]

Next, the plaintiff cites to two additional cases to support the assertion that a sale of goods is not necessary for a "transaction in goods." 3Com Corp. v. Electronic Recovery Specialists, Inc., 104 F. Supp. 2d 932, 936 (N.D. Ill. 2000) (an agreement where a company obtained scrap metal from a manufacturer, sold that scrap to buyers, and shared the proceeds with the manufacturer was held to be predominantly one for sale of goods and

---

[2] Nowhere in the Complaint, does the plaintiff allege that the prescription medications at issue belong to or are in possession of the defendant. In addition, the Complaint also fails to provide any factual allegations that support the assertion that the contract facilitates or governs sales of goods between the defendant itself and the plaintiff. *See* Doc. 1. While it does provide allegations that the defendant's actions have an effect on the plaintiff's sales with consumers, this alone is not enough under the current case-law to establish a "transaction in goods." *Id.* ¶¶88, 91, 95, 102, 118, 130.

governed by Article 2); Crossroads Ford Truck Sales, Inc. v. Sterling Truck Corp., 792 N.E.2d 488, 495 (Ill. App. Ct. 2003) (franchise agreement between a truck dealer and truck and part manufacturer governing the sale and services for manufacturer's products was a contract dealing predominantly with sale of goods and governed by Article 2). In both cases cited, like *In re Pearson*, the agreement or contract focused on goods owned by or in the possession of one of the parties, that were transferred to the other party for sale. Because the relationships were both centered upon title of goods transferring from one party to the other and the subsequent sale of such products, these cases too are distinguishable from the case at bar and thus do not guide the court's analysis.[3]

In fact, the Complaint in this case specifically states that the "predominant purpose of the contractual relationship . . . is to outline the parameters of, and to effect[sic], reimbursement to Plaintiffs on their sales of prescription drugs." (Doc. 1, ¶130). This statement frames the contractual relationship between the parties in terms of services, not sales. It makes clear that the purpose is to outline parameters of reimbursement, which then affect reimbursement amounts the plaintiff receives from the plan provider on their

---

[3] The court has reviewed Illinois case-law interpreting the definition of "transaction in goods" in situations where the contract does not involve a sale of goods, and has found that besides the cases discussed above, the case-law focuses predominantly on situations where a party *leases goods* to another party, which is completely distinct from the situation in this case.

sales *with consumers*. The defendant's role is a middleman, a facilitator, between the plaintiff and the plan provider, not the consumer. The plaintiff also states, in the Complaint, that the defendant "provides prescription drug benefit services," (Doc. 1, ¶8), which further refutes the allegation that the defendant is a party to a "transaction in goods."

Ultimately, the court finds that the law only provides a cause of action under the Article 2 if the contract at issue involves a "transaction in goods," and taking the facts alleged in the Complaint to be true, there are no facts to establish a relationship between the plaintiff and defendant that involves a sale of goods or that fits into the minimally expanded definition of "transaction in goods" for the purpose of Article 2. Rather, the contract solely involves services provided by the defendant. Therefore, the plaintiff fails to present a plausible cause of action under the UCC, and the defendant's motion to dismiss Count I of the Complaint for failure to state a claim must granted.[4]

Furthermore, while the court finds that the contractual relationship between the parties here does not constitute a "transaction in goods," we find it important to note that this finding is not based upon the defendant's reading of *Harris Trust and Sav. Bank v. McCray*, which the defendant discusses at length in its memoranda. 316 N.E.2d 209 (Ill. App. Ct. 1974). The defendant

---

[4] Because the court finds that the contract does not involve a "transaction in goods" at all, we therefore find it unnecessary to conduct a "predominant purpose" analysis to determine whether Article 2 applies. *See* Seilinski v. Miller, 660 N.E. 2d 1289 (Ill. App. Ct. 1995).

claims that *Harris Trust* stands for the proposition that "Article II does not apply to a contract simply because it bears some relationship to a separate contract between different parties involving the sale of goods." (Doc. 15, p. 5-6). However, we disagree with such a broad conflation of the holding in *Harris Trust*. In *Harris Trust,* the main question was whether the contract between the debtor credit card holder and the bank who issued the card involved a sale of goods or constituted a loan, when the underlying debt resulted from a purchase of goods from a merchant. *Harris Trust,* 316 N.E.2d 209. The court determined that the agreement between the bank and debtor was a loan agreement, and therefore did not constitute a sale of goods. *Harris Trust* demonstrates that a situation involving a "tripartite relationship" where one party's (the bank's) role is distinct from, but nevertheless affects, the contractual sale of goods relationship between the other two parties does not constitute a sale of goods between the bank and the debtor. This holding cannot be conflated into the broad principle that the defendant would like this court to adopt. Instead, it provides a specific example of a loan agreement between two parties that happens to affect a sale of goods, but that is not so intertwined or related to a sale of goods to constitute a transaction in goods.

> **B.    Illinois Law Provides a Limited Cause of Action for Breach of Contract When a Party Exercises Contractual Discretion in Bad Faith**

The defendant also moves to dismiss Counts II through IV of the

13

Complaint for failure to state a claim. The defendant alleges that Illinois law does not recognize an independent cause of action for a breach of the implied covenant of good faith and fair dealing, and further that the facts alleged in the Complaint solely demonstrate behavior by the defendant that is consistent with the express terms of the contract and expectations of both parties. (Doc. 11, p. 17). The plaintiff, on the other hand, argues that the defendant has "exercised, and continues to exercise, its absolute discretion unreasonably, arbitrarily, and in bad faith." (Doc. 13, p. 9); (*see also* Doc. 1, pp. 29-37).

As both parties agree, Illinois law governs the claims in this case. (Doc. 1, ¶129); (Doc. 11, p.13 n.9). Illinois law provides that "every contract implies good faith and fair dealing between the parties to it." Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1443 (7th Cir. 1992) (citing Martindell v. Lake Shore Nat'l Bank, 154 N.E.2d 683, 690 (Ill. 1958)). However, under Illinois law, "the covenant of good faith and fair dealing has never been an independent source of duties for the parties to a contract." *Beraha*, 956 F.2d at 1443; *see also* Voyles v. Sandia Mortg. Corp., 751 N.E.2d 1126 (Ill. 2001). While it is not an independent cause of action, "the covenant [of good faith] guides the construction of explicit terms in the agreement," *Beraha*, 956 F.2d at 1443, and "ensures that parties do not try to take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or to do anything that will destroy the other party's right to receive the benefit of the contract." Cramer v. Ins. Exch. Agency, 675 N.E.2d 897, 903 (Ill.

14

1996). Moreover, the Illinois Supreme Court stated, "where an instrument is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted." Martindell v. Lake Shore Nat. Bank, 154 N.E.2d 683, 690 (Ill. 1958).

The covenant of good faith and fair dealing is triggered when a party is vested with broad contractual discretion to perform its obligations under the contract. Dayan v. McDonald's Corp., 466 N.E.2d 958, 990-91 (Ill. App. Ct. 1984). When a party is given such discretion, it "must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Dayan*, 466 N.E.2d at 972; Interim Health Care of N. Illinois, Inc. v. Interim Health Care, Inc., 225 F.3d 876, 884 (7th Cir. 2000); Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1443 (7th Cir. 1992).

Because the covenant of good faith and fair dealing is a tool of contract construction for determining the intent of contracting parties, a contract term that *explicitly* grants discretion to a party does not invoke application of the covenant unless such term is ambiguous or open to more than one interpretation. *See* LaSalle Nat'l Ass'n v. Moran Foods, Inc., 477 F. Supp. 2d 932, 937 (N.D. Il. 2007). An unambiguous, explicit term is presumed to be within contemplation of parties to the contract and within the *reasonable expectations* of the parties. *LaSalle*, 477 F. Supp. 2d at 937. As a result, such discretion does not invoke the covenant, even if the term creates an

15

unfavorable result for one of the parties. *See id.* (language in a lease explicitly providing the defendant with an "absolute right" to prohibit construction on the property was held to be unambiguous and not subject to the covenant of good faith and fair dealing); Continental Mobile Telephone Co., Inc. v. Chicago SMSA Ltd. P'ship, 587 N.E.2d 1169, 1174 (Ill. App. Ct. 1992) (contract term allowing the defendant to raise its cellular telephone rates at its "sole discretion" was within the reasonable expectations of the parties and did not constitute a breach of the covenant of good faith). However, when "a party's contractual obligation is '*contingent upon a condition* particularly within the power of that party,' the controlling party's discretion in bringing about the condition is limited by the implied covenant of good faith," regardless of whether the contract explicitly and unambiguously grants such discretion. Wilson v. Career Ed. Corp., 729 F.3d 665, 674 (7th Cir. 2013) (quoting *Dayan*, 466 N.E.2d at 971); *see also Beraha*, 956 F.2d at 1443; Deom v. Walgreen Co., 591 F. App'x 313, 315-16 (6th Cir. 2014) (applying Illinois law). The plaintiff in this case misconstrues the case-law and states that *any* discretion granted to a party to a contract requires the application of the covenant of good faith, when in fact, as outlined above, solely discretion granted through ambiguous terms or discretion as outlined in *Dayan* invokes the covenant.[5] (Doc. 13, pp. 9-10).

---

[5] The plaintiff contends that "Illinois law recognizes that whenever a party is given discretion under a contract, it must exercise that discretion

Therefore, to determine whether a valid claim for breach of contract for failure to abide by the covenant of good faith and fair dealing exists, the court must first determine whether the contract grants broad discretion to one of the

---

reasonably and in good faith." (Doc. 13, p.10). This is an overly broad misstatement of the current state of Illinois law as it fails to take into account the specific type of contractual discretion that actually triggers the covenant of good faith and the exception established in *Dayan*. The plaintiff cites numerous cases to support its erroneous proposition. The plaintiff relies on *Interim Health Care of Northern Illinois, Inc. v. Interim Health Care, Inc.*; in that case, the contract at issue granted the defendant with "unspecified level of discretion" which created *vagueness* and *ambiguity* in the discretion granted and thus required that the defendant exercise such discretion in good faith. Interim Health Care of N. Illinois, Inc. v. Interim Health Care, Inc., 225 F.3d 876, 884, 885 (7th Cir. 2000). The plaintiff also relies upon *Wilson v. Career Ed. Corp.*, where the court dealt with the narrow exception carved out in *Dayan*, namely the rule that the covenant of good faith applies when a party is given discretion in bringing about a condition precedent, which triggers that party's own obligation under the contract. Wilson v. Career Ed. Corp., 729 F.3d 665, 674 (7th Cir. 2013). Though the defendant in *Wilson* was given unambiguous, explicit discretion to terminate the Plan and not pay unearned bonuses, this discretion clearly triggered the defendant's own obligation under the contract. Thus, the discretion in *Wilson* is the precise type of contractual discretion contemplated in *Dayan,* and is limited by the covenant of good faith. *Id.* at 674. The plaintiff also cites *Carrico v. Delp,* an Illinois appellate case with facts that, like *Wilson*, fit the narrow exception for contractual discretion established in *Dayan*, and, therefore, *Carrico* does not support the plaintiff's proposition. *Carrico v. Delp*, 490 N.E.2d 972 (Ill. App. Ct. 1986). The final case that the plaintiff cites to support its contention is a diversity case from the D.C. Circuit, which applies Virginia law, not Illinois law, and as a result is neither relevant nor applicable to the present case. *See* Tymshare, Inc. v. Covell, 727 F.2d 1145, 1154 (D.C. Cir. 1984). Ultimately, the plaintiff misconstrues the holdings of these cases, and has not provided any case to support the broad principle it would like this court to apply to the instant action.

parties. If so, the court must next determine whether such discretion was explicit and unambiguously granted to the party, such that it was in full contemplation and understanding of both parties. Finally, if the discretion was explicitly granted, then the court must only apply the covenant of good faith if the party has discretion in bringing about a condition that trigger's that party's contractual obligation. *See* *Wilson*, 729 F.3d 665, 674 (7th Cir. 2013) (quoting *Dayan*, 466 N.E.2d at 971). If the discretion was not explicitly and unambiguously granted, then the court must ensure that the party exercises its discretion "reasonably and with proper motive," and not "arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Dayan*, 466 N.E.2d at 972.

In Counts II and IV of the Complaint, the plaintiff alleges that the defendant "breached the reimbursement terms of the Contracts and the duty of good faith in setting commercially unreasonable rates," (Doc. 1, ¶164), and "by failing to update its MAC prices in good faith and in a commercially reasonable manner." *Id.* ¶205. The Complaint includes excerpts from the defendant's Provider Manual (which governs the contractual relationship along with the Provider Agreements) that outline the method of providing the plaintiff with reimbursement for prescription medications:

> [Providers] are reimbursed for prescription drugs at the lesser of the plan or network Average Wholesale Price (AWP) discount or other referenced based pricing; plus or minus a discount or maximum allowable cost (MAC) (when applicable for prescription drug products); the Provider's submitted gross amount due, the

18

> Provider's Usual and Customary price (U&C) that would be given under the same circumstances if the member did not possess prescription benefit coverage; or submitted ingredient cost, and the applicable plan or network dispensing fee including taxes if applicable.

(Doc. 1, ¶114 (quoting the Provider Manual, Doc. 1, Ex. 1, p. 5-6)). The Complaint also provides that the MAC price "is developed by Catamaran and may be amended *at any time at its sole discretion*." *Id.* ¶116 (quoting the Provider Manual, Doc. 1, Ex. 1, p. 6). The plaintiff alleges that the consequence of the abovementioned contract terms is that the plaintiff and other pharmacies in the network are reimbursed at the smallest of the four listed rates, which will "by design always be Catamaran's MAC price." *Id.* ¶118.

First, the contract grants the defendant with broad discretion in its determination and adjustment of the MAC price, which then affects the reimbursement price. Second, the language in the contract clearly and unambiguously gives the defendant "sole discretion" to develop or amend MAC prices "at any time." (Doc. 1, ¶116 (quoting the Provider Manual, Doc. 1, Ex. 1, p. 6)). Like the contract term in *Continental Mobile Telephone Company, Inc. v. Chicago SMSA Limited Partnership,* the contract term here explicitly grants the defendant complete discretion and was in full contemplation of the parties at the time of formation. 587 N.E.2d 1169, 1174 (Ill. App. Ct. 1992); *see also* Abbott v. Amoco Oil Co., 619 N.E.2d 789, 796 (Ill. App. Ct. 1993). Both parties were aware, at the time of formation, that the

defendant had authority to modify its MAC prices at any time, and thus, the defendant's conduct in exercising such contractual right cannot be characterized as a breach of the covenant of good faith. The discretion granted does not trigger a condition precedent, and thus is not the type contemplated in *Dayan*. As such, the narrow exception for applying the covenant of good faith does not apply to this contractual provision. Because the covenant of good faith and fair dealing does not apply to the explicit provisions referenced in Counts II and IV, there is no plausible claim for a breach of the covenant of good faith as it relates to the defendant's price setting founded upon its MAC price development and its MAC price adjustment methods. Counts II and IV of the plaintiff's complaint must be dismissed for failure to state a claim.

In Count III, the plaintiff claims that the defendant violated its duty of good faith and fair dealing by conducting its appeals process in bad faith. (Doc. 1, ¶¶166-183). Again, we must apply the case-law and methodology described above. First, the contract here provides the defendant with broad discretion in handling MAC pricing appeals. The language in the Provider Manual provides:

> MAC pricing appeals should always be directed to Catamaran; appeal requests must be submitted on our current form available at www.informedRx.com/pharmacies. All fields on the form are required; incomplete forms may not be acknowledged. Your most recent invoice for the NDC submitted on the claim must accompany the appeal form. Please download these forms and submit using the fax numbers provided on the form within 45 days

of the claim fill date. Responses will only come via fax to the
original requesting Provider.

(Doc. 1, Ex. A, p. 20). The language indicates that the defendant is in control

of and independently resolves all MAC pricing appeals. This provision of the

contract affords the defendant a significant amount of discretion with regard

to handling and deciding pricing appeals, which thus triggers the covenant of

good faith and fair dealing. However, unlike Count II, the discretion at issue

is not explicitly granted in the contract provision itself. Therefore, the parties

did not contemplate or reasonably expect that the defendant would have

complete and unbridled discretion to resolve (or fail to resolve) MAC pricing

appeals in any way it sees fit. The absence of explicit terms carving out the

method of appeals adjudication or any guidelines or standards leaves gaps,

which create ambiguity in the contract language. Therefore, the covenant of

good faith and fair dealing, as a tool of contract construction, applies and aids

the court in filling the gap left open by the contract language. The defendant's

discretion to administer and decide appeals must be exercised "reasonably

and with proper motive," and not "arbitrarily, capriciously, or in a manner

inconsistent with the reasonable expectations of the parties." *Dayan*, 466

N.E.2d at 972. At this stage in litigation, the standard is whether the plaintiff

has pled sufficient facts that, if taken to be true, establish a claim that the

manner in which the defendant conducted its MAC pricing appeals constitutes

bad faith. After combing through and separating the facts from conclusory

allegations, the court finds that the facts alleged demonstrate the defendant's failure to promptly respond to appeals, the defendant's failure to respond to appeals at all, and the defendant's failure to retroactively reimburse the plaintiff's successful appeals.[6] The court further finds that these factual allegations are enough to establish a plausible claim that the MAC pricing appeals were not reasonable and were conducted "arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties," *ie.* a claim for bad faith. *Dayan*, 466 N.E.2d at 972. Therefore, the motion to dismiss Count III is denied.

---

[6] Plaintiff alleges the following in the Complaint: "If Plaintiffs and other independent pharmacies disagree with Catamaran's reimbursement rate, their MAC pricing appeals are often dismissed in summary fashion with no real explanation." (Doc. 1, ¶171). "On the rare occasions where Catamaran grants a MAC pricing appeal, the changes are uniformly incremental and delayed, and Catamaran does not pay the increased price retroactively. Notably, it does not pay the increased price on the very transaction or transactions prompting the MAC pricing appeal in the first place. These practices continue to this day in spite of Catamaran's representation to the South Carolina legislature almost one year ago that 'Catamaran is in the process of implementing a retroactive reimbursement process for pharmacies affected by the change in MAC pricing.'" *Id.* ¶173. Between January 1, 2012 and the date of the Complaint, the plaintiff submitted MAC pricing appeals and were successful with one or more of the appeals. *Id.* ¶¶174-75. During the same time period, the plaintiff did not receive retroactive compensation or any type of compensation for any successful MAC pricing appeals. *Id.* ¶176. MAC pricing appeals are decided over the course of several weeks to several months. *Id.* ¶179. The plaintiff has suffered economic losses in the form of "the difference between erroneous reimbursement rates and the rates that were supposed to be used, as reflected by [the plaintiff's] success with a particular pricing appeal." *Id.* ¶182.

## IV.    CONCLUSION

In light of the foregoing analysis, the court will grant the defendant's motion to dismiss for Counts I, II, and IV of the Complaint, but will deny the defendant's motion to dismiss for Count III. An appropriate order shall follow.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**


**Dated:  December 9, 2015**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2015 MEMORANDA\15-0290-01.wpd

23