**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LAKEVIEW PHARMACY OF RACINE, INC.,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:15-290** |
| | : | |
| **v.** | : | |
| | : | **(JUDGE MANNION)** |
| **CATAMARAN CORPORATION** | : | |
| | : | |
| **Defendant .** | | |

## MEMORANDUM

Pending before the court is a motion to strike filed by plaintiff Lakeview Pharmacy of Racine, Inc. ("Lakeview"). (Doc. 58). The plaintiff requests that this court strike the third affirmative defense listed in defendant Catamaran Corporation's ("Catamaran's") answer, (Doc. 57), filed in response to the plaintiff's second amended complaint, (Doc. 53). For the foregoing reasons, the plaintiff's motion is **DENIED**.

## I.    FACTUAL BACKGROUND

The plaintiff is an independently owned community pharmacy. (Doc. 53 ¶1). The plaintiff has one retail and one long-term care pharmacy. (*Id*. ¶27). The defendant is a pharmaceutical benefit manager ("PBM") providing prescription drug benefit services. (*Id*. ¶¶1, 8). The defendant was formerly known as SXC Health Solutions, Inc. ("SXC"). (*Id*. ¶6). In 2012, SXC acquired Catalyst Health Solutions, Inc. ("Catalyst"), a large PBM, through a corporate merger. (*Id*. ¶7). SXC then rebranded itself as the current defendant,

Catamaran. (*Id*.). The defendant has acquired other PBMs since the SXC-Catalyst merger, including Restat LLC and Walgreens Health Initiative. (*Id*. ¶8).

PBMs contract with insurance companies, self-insured employers, and government entities ("plan sponsors") to administer prescription drug benefit programs. (*Id*. ¶16). A PBM will, typically, develop a list of drugs covered by a particular plan sponsor; this list is often called a "formulary." (*Id*. ¶19). Retail pharmacies access the PBM network by contracting with the specific PBM acting as the middleman between the plan sponsors and the members of that plan ("plan members"). (*Id*. ¶20). The plan members are the pharmacies' customers. (*Id*.). Retail pharmacies interact with a variety of PBMs, which is wholly dependant on the particular plan member or customer; the customer's insurance card will identify the particular PBM using a six-digit Rx Bin number. (*Id*. ¶23).

The relationship between the defendant, a PBM, and independent pharmacies is contractual in nature, but the defendant does not directly negotiate with pharmacies. (*Id*. ¶25). The contract is negotiated through a pharmacy services administration organization ("PSAO") serving as the pharmacy's agent. (*Id*. ¶¶26, 88). The plaintiff's relationship with the defendant is based on contracts, also known as provider agreements, that the defendant negotiated with a PSAO. (*Id*. ¶27). The particular provider agreement at issue in this case is an agreement negotiated between the

2

plaintiff's PSAO, an entity known as TriNet, and the defendant before the defendant rebranded itself (the SXC Provider Agreement).

The plaintiff alleges that the defendant uses confidentiality agreements with PSAOs to keep critical aspects of provider agreements hidden from independent pharmacies, including the plaintiff. (*Id*. ¶28). The defendant has denied this allegation. (Doc. 57 at 14). The plaintiff alleges that the defendant has precluded the plaintiff and other independent pharmacies from obtaining copies of "fully executed contracts that govern all aspects of their drug reimbursement" from the defendant. (Doc. 53 ¶29). The defendant has admitted that it does not provide copies of provider agreements to non-parties to those agreements. (Doc. 57 at 14). The pharmacies do receive provider manuals and state-specific addendums. (*See* Doc. 53 ¶¶36, 99). The plaintiff relies on a 2013 Provider Manual it received. (*See id*. ¶36). It is not clear if the pharmacies receive anything else, though, based on the plaintiff's allegations the pharmacies do not receive the full contract.[1] It is also not clear how many "versions" of a provider manual exist. (*See id*.).

Generally, a PBM will handle claim processing as the middle man

---

[1] In the original complaint, the pharmacies, including the remaining plaintiff, alleged that they received "plan data sheets" or other summary-form documents, which are typically short and contain only certain principal terms of the provider agreement. (Doc. 1 ¶111). This allegation is not included in the second amended complaint. Either this original allegation did not apply to Lakeview, specifically, or it did and it is simply not included in the second, amended version of the complaint.

between plan members and plan sponsors. This process begins when a customer/plan member presents his or her insurance and drug prescription card to a pharmacist. (*Id*. ¶30). The pharmacist will then submit a product selection code to the PBM, fill the prescription, and charge the customer/plan member the co-pay set by his or her plan sponsor. (*Id*. ¶¶31–32). It is at this point of sale that the pharmacist learns the amount of reimbursement for the product from the PBM; this process is referred to as claim adjudication. (*Id*. ¶¶32–33). Although the pharmacist learns the reimbursement amount at the point of sale, actual reimbursement to the pharmacy occurs on a bi-monthly cycle. (*Id*. ¶34).

In addition to processing reimbursements, in some cases the defendant also sets the reimbursement rate for products and services. (*Id*. ¶37). The plaintiff alleges that for brand name drugs the defendant reimburses at a percentage of the average wholesale price ("AWP") of the drug, plus a dispensing fee. (*Id*. ¶38). The AWP is tied to pricing metrics published by third-party sources. (*Id*.). In contrast, for multi-source generic drugs, the defendant sets reimbursement based on a maximum allowable cost ("MAC"), which is a discount from the AWP. (*Id*. ¶42). The defendant's MAC price list specifies the maximum per unit reimbursement to be paid to a pharmacy for a generic drug, regardless of the manufacturer of the drug, in an attempt to encourage pharmacies to seek the lowest price from a wholesaler for that drug. (*Id*. ¶45).  The defendant's MAC lists form part of its formulary. (*Id*. ¶47).

4

The defendant does not disclose the formula or methodology it uses to calculate and adjust its MAC prices. (*Id*. ¶48).

The plaintiff alleges that the defendant's MAC prices/formulas are not tied to market conditions for the particular, multi-source generic drug being priced. (*Id*. ¶49). The plaintiff alleges that the defendant penalizes independent pharmacies like the plaintiff by using the lowest of multiple MAC prices for reimbursement. (*Id*. ¶54). Most state Medicaid MAC lists are, allegedly, directly linked to the pharmacy's acquisition cost or indirectly linked to that cost using corollary cost measures. (*Id*. ¶51). The plaintiff alleges that the defendant's MAC methodology is not linked to acquisition costs.

The plaintiff also alleges that the defendant manipulates its MAC prices based on market price adjustments to a drug by a manufacturer. The plaintiff alleges that the defendant delays increasing its MAC price reimbursement rate if there is an increase by manufacturers of that drug, but that the defendant immediately decreasing the reimbursement if there is a decrease in the price of the drug. (*See id*. ¶¶63–69). The plaintiff alleges that the speed at which the defendant updates its MAC lists is not commercially reasonable. (*Id*. ¶69).

The plaintiff's 2013 Provider Manual provides the pricing mechanism to be used by the defendant, in addition to the actual SXC Provider Agreement. (*See id*. ¶91).The 2013 Provider Manual does allow the defendant to amend its MAC prices, but requires the defendant to "utilize client or plan parameters,

5

Medi-Span[,] or other national source[s], and internal processes as a reference but not as the sole determinant of price." (*See id*. ¶101). It also states that the pharmacy's "[r]eimbursement will be limited by the pharmacies submitted ingredient cost plus dispensing fee." (*Id*.). The plaintiff also alleges that the provider agreement between itself and the defendant requires that there be a single MAC price for a particular drug filled in particular quantity at a particular time. (*Id*. ¶105).

The plaintiff's 2013 Provider Manual also provides a mechanism for the pharmacy to challenge a MAC priced reimbursement. (*Id*. ¶94). The plaintiff's MAC pricing appeals were submitted through its PSAO, TriNet, and only the PSAO received the results of that appeal. (*Id*. ¶96). The plaintiff alleges that the defendant routinely rejects these appeals even if the MAC price is below the pharmacy's acquisition cost. (*Id*. ¶116). The plaintiff also alleges that the defendant does not reimburse retroactively even if an appeal is successful. (*Id*. ¶97). The defendant admits that it has not reimbursed the plaintiff after a successful MAC price appeal. (Doc. 57 at 45).

## II.    PROCEDURAL BACKGROUND

On February 9, 2015, the plaintiff, along with twenty-eight other independently owned community pharmacies, originally filed this action against the defendant asserting several breach of contract claims based on various provider agreements with the defendant. (*See* Doc. 1). The original

claims included the following: (1) breach of contract under the Uniform Commercial Code (Count I); (2) breach of the duty of good faith and fair dealing in setting prices for prescription drugs (Count II); (3) breach of the duty of good faith and fair dealing during the MAC pricing appeals (Count III); and (4) breach of the duty of good faith and fair dealing for failing to update MAC prices (Count IV). (*Id.*).

On April 20, 2015, the defendant filed a motion to compel arbitration, coupled with a motion to dismiss any non-arbitrable claims. (Doc. 11). The defendant attached an affidavit and several exhibits to that motion listing the various plaintiff pharmacies, their associated PSAO, and copies of corresponding provider agreements. (Doc. 11-2). On April 30, 2015, the original plaintiffs informed the court that they would not challenge the defendant's arguments with respect to arbitration. (Doc. 12). The parties stipulated that any plaintiff pharmacy with an arbitration clause in its corresponding provider agreement would be given time to verify that agreement with its agent and also agreed that all claims relating to a contract with an arbitration clause would be stayed pending arbitration. (*Id.*).

In light of the exhibits attached to the motion and the plaintiffs' failure to challenge the validity of the arbitration clauses in the various provider agreements, on July 16, 2015, the court partially resolved the defendant's motion by granting the motion to compel arbitration with respect to all parties except for the current plaintiff, Lakeview. (Doc. 20). Lakeview's PSAO was

7

listed as TriNet and the agreement between TriNet and the defendant did not contain an arbitration clause. (Doc. 11-2 at 3, 111–127). Then, on December 9, 2015, the court granted in part and denied in part the defendant's motion to dismiss with respect to Lakeview as the remaining plaintiff. (Doc. 29). Specifically, the court granted the defendant's motion to dismiss with respect to Counts I, II, and IV, but denied the motion to dismiss with respect to Count III. (*Id.*).

On December 23, 2015, the plaintiff filed its first motion for leave to file an amended complaint. (Doc. 30). On June 13, 2015, the court granted in part and denied in part the plaintiff's request for leave. (Doc. 42). The court allowed the plaintiff to remove factual allegations relating to parties that were no longer part of the action and allowed the plaintiff to plead an express breach of contract claim using three different theories. The court denied the plaintiff's attempt to replead the UCC claim that was dismissed and would not allow the plaintiff to add a claim based on the legal theory of quantum meruit. On June 16, 2016, the plaintiff filed an amended complaint which, in accordance with the court's decision, contained two counts, one for express breach of contract (Count I) and one based on the implied duty of good faith and fair dealing (Count II). (Doc. 47). Count I was premised on three theories: (1) that the defendant's failure to use certain independent sources in its MAC pricing methodology constituted a breach of contract; (2) that the defendant's decision to set reimbursement prices below acquisition costs constituted a

breach of contract; and (3) and that the defendant's use of multiple MAC prices for reimbursement constituted a breach of contract. Count II was identical to the claim pled in Count III of the original complaint, (Doc. 1), alleging that the defendant breached the duty of good faith and fair dealing in its handling of MAC pricing appeals.

On June 23, 2016, the plaintiff filed a second motion to amend its complaint. (Doc. 48). The plaintiff wished to correct technical errors in the first amended complaint. The motion was unopposed by the defendant. On June 27, 2016, the court granted the plaintiff's request and allowed the plaintiff to correct these errors. (Doc. 51). The plaintiff's second amended complaint was filed on June 30, 2016. (*See* Doc. 53). On July 14, 2016, the defendant filed an answer to the second amended complaint, including responses to the plaintiff's allegations in the second amended complaint and eight affirmative defenses. (Doc. 57). Currently at issue is the defendant's third affirmative defense which states, "Any portion of Lakeview's claims that are based on an alleged breach of the [a]greement that occurred more than one year prior to the filing of the Complaint are barred by Section 9.1 of the SXC Provider Agreement." (Doc. 57 at 59). Section 9.1 provides a one-year limitations period for bringing claims. (*See id*.).

On July 26, 2016, the plaintiff filed the current motion seeking to strike the defendant's third affirmative defense pursuant to Federal Rule of Civil Procedure 12(f). (Doc. 58). A brief in support of the motion was filed

separately on August 2, 2016. (Doc. 59). On August 9, 2016, the defendant filed a brief in opposition to the plaintiff's motion. (Doc. 60). The plaintiff filed a reply brief on August 16, 2016. (Doc. 61). Thus, the plaintiff's motion has been fully briefed and is now ripe for resolution.

## III.    STANDARD OF REVIEW

Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). This may be done by the court *sua sponte* or on a motion filed by a party. FED. R. CIV. P. 12(f)(1)–(2). "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." *McInerney v. Moyer Lumber & Hardware, Inc.*, 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002). These motions "serve a useful purpose by eliminating insufficient defenses and saving the time and expense which would otherwise be spent in litigating issues which would not affect the outcome of the case." *United States v. Kramer*, 757 F. Supp. 397, 410 (D.N.J. 1991). However, they are "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *McInerney*, 244 F. Supp. 2d at 402. Striking a pleading "is a drastic remedy to be resorted to only when required for the purposes of justice" and should be used "sparingly." *DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 428 (E.D. Pa. 2007) (quoting

*North Penn Transfer, Inc. v. Victaulic Co. of Am.*, 589 F. Supp. 154, 158 (E.D. Pa. 1994)).

The motion should be decided on the basis of the pleadings alone. *North Penn Transfer*, 859 F. Supp. at 159. In assessing the pleadings, the court may also consider documents whose contents are alleged in the complaint so long as no party questions the authenticity of those documents. *See Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (directly addressing the standard under Rule 12(b)(6) for motions to dismiss). Where the motion to strike is premised on the insufficiency of a defense, this insufficiency should be "clearly apparent." *North Penn Transfer*, 859 F. Supp. at 158 (quoting *Cipillone v. Liggett Grp., Inc.*, 789 F.2d 181, 188 (3d Cir. 1986)). A defense is insufficient if it is not recognized as a defense to the cause of action. *Id*. The defense may be deemed insufficient and stricken "only if the defense asserted could not possibly prevent recovery under any pleaded set or inferable set of facts." *Id*. at 159 (quoting *United States v. Pennsalt Chems. Corp.*, 262 F. Supp. 101 (E.D. Pa. 1967)). The motion should not be granted where the sufficiency "depends on disputed issues of fact." *Id*. In addition, the motion should not be used as a means to determine "disputed and substantial questions of law." *Id.*

## IV.   DISCUSSION

The parties do not dispute that the limitations period in the SXC Provider Agreement is a recognized defense under the laws of the state of Illinois.[2] *See, e.g., Can. Life Assurance Co. v. Salwan*, 817 N.E.2d 1021, 1027 (Ill. App. Ct. 2004). Instead, the plaintiff's motion is premised on two arguments: (1) that the one-year limitations period in the SXC Provider Agreement is unconscionable under Illinois law and, thus, the defense is

---

[2] When sitting in diversity the court applies the choice of law principles of the forum state—here, Pennsylvania—to determine the controlling law. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941); *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 206 (3d Cir. 2013). Pennsylvania courts, generally, honor the intent of contracting parties and will enforce a choice of law provision in a contract unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue.

*Gay v. Creditform*, 511 F.3d 369, 389 (3d Cir. 2007) (quoting RESTATEMENT (SECOND) CONFLICT OF LAWS §187 (1971)).

The SXC Provider Agreement provides that the laws of the state of Illinois and of the United States of America will govern the interpretation, validity, and effect of the agreement. (Doc. 60-1 ¶12.2). The parties agree that Illinois law governs this dispute. The defendant has its principle place of business in Illinois. (Doc. 53 ¶6; Doc. 57 at 4). As such, there is a reasonable basis for the parties choice of law provision and it will be honored by this court.

insufficient and (2) that the defense should be stricken because it is inconsistent with the defendant's answers to the allegations in the plaintiff's second amended complaint. With respect to the first argument, there are significant issues of fact and questions of law that must be resolved before the court can fully assess the plaintiff's argument regarding unconscionability. The plaintiff's second argument is without merit and is inconsistent with the entire basis for this action. Accordingly, the plaintiff's motion will be denied.

### A.    Unconscionability

In Illinois, the statute of limitations for a breach of contract action is ten years. 735 ILL. COMP. STAT. ANN. 5/13-206. "[P]arties to a contract may agree upon a shortened contractual limitations period to replace the statute of limitations so long as it is reasonable." *Can. Life Assurance*, 817 N.E.2d at 1027. In addition, under Illinois law, a contract provision will be deemed unconscionable if it is either procedurally or substantively unconscionable. *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 263 (Ill. 2006). Thus, "[u]nconscionability can be either procedural or substantive or a combination of both." *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622 (Ill. 2006). The court can make neither finding on the basis of the pleadings alone.

I.   Procedural Unconscionability

"Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it." *Kinkel*, 857 N.E.2d at 264 (quoting *Razor*, 854 N.E.2d at 622). "This analysis also takes into account the disparity of bargaining power between the drafter of the contract and the party claiming unconscionability." *Id.*

> Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice. Factors to be considered are all the circumstances surrounding the transaction including the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print; both the conspicuousness of the clause and the negotiations relating to it are important, albeit not conclusive factors in determining the issue of unconscionability. To be a part of the bargain, a provision limited the defendant's liability must, unless incorporated into the contract through prior course of dealings or trade usage, have been bargained for, brought to the purchaser's attention or be conspicuous. . . . [T]he mere fact that both parties are businessmen [does not] justify the utilization of unfair surprise to the detriment of one of the parties. . . . Rather, freedom to contract is enhanced by a requirement that both parties be aware of the burdens they are assuming.

*Id*. at 264–65 (quoting *Franks Maint. & Eng'g, Inc. v. C. A. Roberts Co.*, 408 N.E.2d 403, 410 (Ill. App. Ct. 1980)) (internal citation placement omitted).

Here, the plaintiff's argument is premised on the fact that a PSAO,

TriNet, negotiated the SXC Provider Agreement on behalf of the plaintiff. The plaintiff contends it had no opportunity to review the contract and agree to its terms and that the disparity between the defendant and the plaintiff is evident. In response, the defendant asserts that the plaintiff should be imputed with knowledge since TriNet was serving as its agent in the underlying negotiations. In further response to this, the plaintiff asserts that the defendant requires PSAOs to keep the terms of the agreement confidential from pharmacies and, thus, knowledge cannot be imputed to the plaintiff under traditional principles of agency. Whether the defendant requires PSAOs to keep the confidentiality of provider agreements from the pharmacies they are negotiating on behalf of is, at this stage, a disputed issue of law and fact that cannot be resolved on the pleadings alone.

"An agent must make known to his principal all material facts within the agent's knowledge which may in any way affect the transaction and subject matter of his agency, and the agent's knowledge relative to the transaction is imputed to its principle." *Protective Ins. Co. v. Coleman*, 494 N.E.2d 1241, 1250 (Ill. App. Ct. 1986) (internal citation omitted). Thus, when an agent learns of a fact within the scope of the agency relationship, the principle has constructive notice of these facts. *Lombardo v. Reliance Elevator Co.*, 733 N.E.2d 874, 882 (Ill. App. Ct. 2000). "The rule charging a principle with the knowledge of his agent is subject to the qualification that the agent is at liberty to communicate his knowledge and that it is his duty to do so." *Neuberg v.*

*Clute*, 126 N.E.2d 648, 651 (Ill. 1955). In addition, "[a]n exception to this rule exists where the agent's interests are adverse to the principle." *McRaith v. BDO Seidman, LLP*, 909 N.E.2d 310, 331 (Ill. App. Ct. 2009).

Here, the plaintiff has expressly stated that the PSAO that negotiated its agreement with the defendant, *i.e.*, TriNet, was acting as its agent in the underlying negotiation. (Doc. 53 ¶88). The court could only find one allegation that suggested that TriNet was under a duty not to disclose information to the plaintiff, an allegation that the defendant expressly denied. In paragraph twenty-eight of the second amended complaint, the plaintiff alleged as follows:

> Catamaran exploits independent pharmacies' required reliance on PSAOs in order to keep critical aspects of the contracts hidden from Plaintiff and other independent pharmacies. Catamaran does this through confidentiality agreements with PSAOs.

(*Id.* ¶28). The defendant denied the entirety of this allegation. (Doc. 57 at 14). There are no other facts to indicate the relationship between the plaintiff and its PSAO. Thus, whether or not TriNet's knowledge can be imputed to the plaintiff remains an issue of law and fact that the court cannot resolve at this stage.

Next, the court disagrees that the bargaining disparity between the parties is evident on the pleadings alone and is enough to find the limitation clause procedurally unconscionable. In this instance, the provider agreement was negotiated by TriNet and the defendant. There is nothing in the pleadings to suggest that the relative bargaining power between these two entities was

16

unequal—PSAOs generally negotiate contracts in bulk, likely giving them more bargaining power than a sole pharmacy acting on its own behalf.

Moreover, Illinois law requires an analysis of the totality of the circumstances in making unconscionability determinations. *Kinkel*, 857 N.E.2d at 264–65. While disparity of bargaining power is relevant to the inquiry, it is not dispositive. *Id*. The court would require more facts before it could determine that the bargaining power between TriNet and the defendant was so unequal that the limitations clause should be deemed procedurally unconscionable as a matter of law. Accordingly, the plaintiff's motion to strike the defendant's third affirmative defense based on procedural unconscionability will be denied.

### ii.  Substantive Unconscionability

The plaintiff also argues that the provision is substantively unconscionable because it is unreasonable, particularly because it is so short and because it was not directly negotiated with the plaintiff and disclosed to the plaintiff. Substantive unconscionability "refers to terms that are 'inordinately one-sided in one party's favor.'" *Kinkel*, 857 N.E.2d at 267 (quoting *Razor*, 854 N.E.2d at 622). It "concerns the actual terms of the contract and examines the relative fairness of the obligations assumed, asking whether the terms are so one-sided as to oppress or unfairly surprise an innocent party." *Phoenix Ins. Co. v. Rosen*, 949 N.E.2d 639, 647 (Ill. 2011)

17

(internal quotation marks omitted). In comparison, procedural unconscionability, as discussed above, refers to "some impropriety during the process of forming the contract depriving a party of meaningful choice." *Id*. (quoting *Kinkel*, 857 N.E.2d at 264).

 As an initial matter, the fact that the limitations period was not disclosed and negotiated through an agent refers to procedural unconscionability and the process of contract formation. This argument triggers the agency/imputation analysis that the court cannot properly address at this stage. Moreover, this is not a proper basis for finding the limitations clause substantively unconscionable.

The plaintiff then argues that the limitations period is unreasonable because it is so short in comparison to the statute of limitations for contract actions. The plaintiff also argues that the period is unreasonably short given the defendant's alleged delay in adjusting MAC prices and during MAC pricing appeals and given the complexity of the claims. The plaintiff has not cited a single case to suggest that a one year limitations period in a contract is *per se* unreasonable. The court is also not persuaded that the alleged complexity of the claims makes the provision substantively unconscionable, at least not on the face of the pleadings alone. The court cannot properly address the plaintiff's remaining arguments at this stage.

As explained above, in Illinois, the statute of limitations for a breach of contract action is ten years, but this may be shortened by the parties so long

as the shortened time period is reasonable. 735 ILL. COMP. STAT. ANN. 5/13-206; Can. Life Assur., 817 N.E.2d at 1027. Provisions requiring suit within a year have been upheld by Illinois courts. *See, e.g., Medrano v. Prod. Eng'g Co.*, 774 N.E.2d 371, 375–76 (Ill. App. Ct. 2002). "[T]here is nothing facially unreasonable about a one-year limitations period." *WFC Commodoties Corp. v. Alston*, No. OOC0044, 2000 WL 33534178, at *1 (N.D. Ill. Mar. 8, 2000). Thus, the fact that the statute of limitations is ten years while the parties contract provides for only one year is not enough, in itself, to find that the provision is *per se* unreasonable or "so one-sided as to oppress or unfairly surprise an innocent party." *Phoenix Ins.*, 949 N.E.2d at 647.

The plaintiff also argues that the time period is unreasonable given the defendant's delay in adjusting its MAC prices and its delay in responding to MAC pricing appeals. The defendant has denied the majority of these allegations in its answer. (Doc. 57 ¶¶31–33, 45). Thus, whether this is true or not remains disputed and cannot be the basis for striking the defendant's affirmative defense at this stage.

Lastly, while the plaintiff characterizes its legal claims as "complex," the court is not exactly sure how that is relevant to bringing a claim in a timely manner in accordance with the parties' agreement. While the court encourages the exercise of due diligence before bringing a claim, the court is unpersuaded that this alone should be reason enough to deem a one-year limitations period substantively unconscionable. Accordingly, the plaintiff's

19

motion to strike the defendant's third affirmative defense based on substantive unconscionability will be denied.

### B.    The Defendant's Answer

Next, the plaintiff argues that the defendant's third affirmative defense is inconsistent with its answers to the allegations set forth in the second amended complaint. The plaintiff reads the defendant's answers as suggesting that the plaintiff is not a party to the agreement and, thus, the plaintiff cannot be bound by the one-year limitations period. The defendant responds by correctly asserting that if the plaintiff is not bound then the plaintiff's claim, necessarily, fails because there is no contractual relationship between the parties. From the court's reading of the pleadings, the defendant's responses do not lead to the conclusion that the plaintiff suggests. If it did, the plaintiff would not have a claim.

The defendant's third affirmative defense clearly states, "Any portion of Lakeview's claims that are based on an alleged breach of the [a]greement that occurred more than one year prior to the filing of the Complaint are barred by Section 9.1 of the SXC Provider Agreement." (Doc. 57 at 59). Section 9.1 provides as follows:

> The parties agree that any action arising out of or relating to this Agreement must be commenced within one (1) year of the date of the breach, or the date the breach reasonably should have been discovered, whichever is later/. [sic] Any action not brought within

> the one (1) year time period will be barred without
> regard to any other limitations period set forth by law.

*(Id.; see also* Doc. 60-1 at 6). It is hornbook contract law that a party will not

be bound to this particular provision unless the party is bound to the contract

itself.

The alleged inconsistency in the third affirmative defense is based on

the defendant's answers to allegations stated in paragraphs twenty-nine and

eighty-nine of the plaintiff's second amended complaint. Paragraph twenty-

nine of the plaintiff's second amended complaint states as follows:

> Catamaran has precluded Plaintiff and other
> independent pharmacies that use a PSAO from even
> obtaining copies of the fully executed contracts that
> govern all aspects of their drug reimbursement from
> Catamaran; it was only through third-party discovery
> in this case that Plaintiff was able to obtain copies of
> at least some of these contracts.

(Doc. 53 ¶29). The defendant responded to this allegation as follows:

> Catamaran admits that it maintains the confidentiality
> of its contractual relationships with pharmacy services
> administration organizations [PSAOs] and that it does
> not provide copies of such contracts to non-parties to
> those agreements, including per the terms of the
> agreements. Catamaran lacks sufficient knowledge to
> form a belief as to the remaining allegations set forth
> in paragraph 29 and, therefore, denies same.

(Doc. 57 at 14).

Similarly, paragraph eighty-nine of the second amended complaint

alleges that "[t]he product of the[] 'negotiations' [between Catamaran and

PSAOs] are provider Agreements, which are made confidential and are kept

secret from Plaintiff and other independent pharmacies." (Doc. 53 ¶89). In response, the defendant, again, "admit[ted] that it maintains the confidentiality of its contractual relationships with [PSAOs] . . . and that it does not provide copies of such contracts to non-parties to those agreements, per the terms of the agreements." (Doc. 57 at 41).

The plaintiff reads the above answers as the defendant admitting the plaintiff is not a party to the provider agreement at issue in this case. The court does not. The plaintiff's allegations refer to the "[p]laintiff and other independent pharmacies" as one unit. (Doc. 53 ¶¶29, 89). Thus, the allegations suggest that the defendant does not share provider agreements with more than one pharmacy. The defendant responds to the plaintiff's allegations regarding multiple pharmacies, the plaintiff and other independent pharmacies, by using the plural form in its response—*i.e.*, the phrase "contractual relationships" and the term "contracts." The court reads the defendant's responses as referring to several provider agreements, not just the SXC Provider Agreement with the plaintiff.

Reading the plaintiff's allegations and the defendant's responses as referring to several contracts which may, or may not be, negotiated through the same PSAO, the fact that the defendant admits it does not provide copies of those contracts to non-parties does not lead to the conclusion that the plaintiff is a non-party to the SXC Provider Agreement. The fact that the defendant does not share all contracts with all PSAOs and their associated

pharmacy with all pharmacies *en masse* does not automatically lead to the conclusion that the plaintiff is not a party to the provider agreement at issue in this case, the SXC Provider Agreement. The plaintiff's reading of the response takes a leap in logic that this court is not prepared to take without further facts. If the defendant does, in fact, view the plaintiff as a non-party to the agreement at issue in this case, that fact is not clearly apparent from the pleadings alone. Contrary to the plaintiff's assertion, the court sees nothing inconsistent between the defendant's third affirmative defense and the defendant's answer to the second amended complaint. Accordingly, the plaintiff's request to strike the third affirmative defense based on the defendant's responses will be denied.

## V.    CONCLUSION

In light of the foregoing, the plaintiff's motion to strike the defendant's third affirmative defense, (Doc. 58), will be **DENIED**. An appropriate order shall follow.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: March 31, 2017**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2015 MEMORANDA\15-0290-04.wpd